Ken Coleman
Jonathan Cho
Joseph Badtke-Berkow
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:    (212) 610-6300
Facsimile:    (212) 610-6399

*Counsel to Shai Weiss, as the Foreign Representative
of Virgin Atlantic Airways Limited*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| VIRGIN ATLANTIC AIRWAYS LIMITED,[1] | Case No. 20-_____ (___) |
| Debtor in a Foreign Proceeding. | |

**VERIFIED PETITION FOR RECOGNITION OF FOREIGN
PROCEEDING AND MOTION FOR ANCILLARY RELIEF**

Shai Weiss is the duly-authorized foreign representative (the **Foreign Representative**) of

Virgin Atlantic Airways Limited (**VAAL**), a private company limited by shares that is the subject

of a proceeding (the **English Proceeding**) commenced under Part 26A of the Companies Act 2006

(as amended or re-enacted from time to time, the **Companies Act**) and pending before the High

Court of Justice of England and Wales (the **English Court**).

The Foreign Representative has commenced this chapter 15 case ancillary to the English

Proceeding and respectfully files this *Verified Petition for Recognition of Foreign Proceeding and

Motion for Ancillary Relief* (the **Chapter 15 Petition**), with accompanying documentation,

---

[1]    The last four digits of the United States Tax Identification Number, or similar foreign identification number, as applicable, for Virgin Atlantic Airways Limited are 3123

pursuant to sections 1504 and 1515 of title 11 of the United States Code (the **Bankruptcy Code**)

seeking the entry of an order substantially in the form annexed hereto as <u>Exhibit A</u> (the **Proposed**

**Order**): (i) recognizing the English Proceeding as a "foreign main proceeding" under section 1517

of the Bankruptcy Code; (ii) subject to the English Court's entry of a sanction order (the **Sanction**

**Order**) sanctioning VAAL's restructuring plan (the **Plan**), giving full force and effect in the

United States to the Sanction Order and the Plan pursuant to sections 105(a), 1507, and 1521 of

the Bankruptcy Code; and (iii) granting related relief.

The Foreign Representative has also filed: (i) a *Memorandum of Law in Support of Verified*

*Petition for Recognition of Foreign Proceeding and Motion for Ancillary Relief* setting forth the

legal argument for the relief sought in the Chapter 15 Petition (the **Memorandum of Law**) and

(ii) an *Ex Parte Application for Temporary Restraining Order and Motion for Provisional Relief*

seeking certain provisional relief pending final disposition of the Chapter 15 Petition (the

**Provisional Relief Motion**).

In support of the Chapter 15 Petition, the Foreign Representative respectfully states as

follows:

## <u>JURISDICTION AND VENUE</u>

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, 11

U.S.C. § 1501, and the *Amended Standing Order of Reference of the United States District Court*

*for the Southern District of New Yor*k, dated January 31, 2012, Reference M-431. *In re Standing*

*Order of Reference Re*: Title 11, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012) (Preska, C.J.). This is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P). Venue is proper in this District pursuant to

28 U.S.C. § 1410. The statutory predicates for the relief requested herein are sections 105(a), 1504,

1507, 1509, 1515, 1517, 1520 and 1521 of the Bankruptcy Code.

## BACKGROUND

1.      For a description of relevant English law, the Court is respectfully referred to the *Declaration of Jennifer Marshall as English Counsel in Support of (i) Verified Petition for Recognition of Foreign Proceeding and Motion for Ancillary Relief and (ii) Ex Parte Application for Temporary Restraining Order and Motion for Provisional Relief* dated August 3 2020, and filed contemporaneously herewith (the **Marshall Declaration**). For a detailed description of VAAL's business, corporate organization, and capital structure, the circumstances leading to the English Proceeding, and the Plan, the Court is respectfully referred to the *Explanatory Statement in Relation to a Restructuring Plan* attached as Exhibit C to the Marshall Declaration (the **Explanatory Statement**). Unpublished or foreign decisions and orders cited in connection with the Chapter 15 Petition and the Provisional Relief Motion are annexed to the *Declaration of Ken Coleman* dated August 4, 2020, and filed contemporaneously herewith (the **Coleman Declaration**).

### A.      Introduction

2.      VAAL, together with its indirect parent Virgin Atlantic Limited (**VAL**) and their various subsidiaries (collectively, the **Group**), is a large U.K.-based air carrier that offers passenger, tour operator, and cargo services.[2] The ongoing COVID-19 pandemic has had an adverse impact on not only the Group, but the aviation industry as a whole, occasioning the near-shutdown of the global passenger aviation industry.[3] While the Group has taken various measures to manage its liquidity in light of the unprecedented financial and operating conditions it faces, a

---

[2]      Explanatory Statement, Part A ¶ 5.5.
[3]      Explanatory Statement, Part A ¶ 8.1.

more comprehensive recapitalization is necessary to secure the future of its business and ensure that it is able to meet its liabilities and funding requirements beyond mid-September 2020.[4]

3.       The Group and its major stakeholders therefore negotiated an in-principle agreement for a recapitalization of the Group, as formalized in various support agreements and term sheets appended to such support agreements (the **Recapitalization**).[5] A key component of the Recapitalization is the Plan, which is a "restructuring plan" under Part 26A of the Companies Act by which VAAL seeks to amend a revolving credit facility and certain lease arrangements, arrangements with trade creditors, and arrangements with its affiliates in order to reduce and/or reschedule its payment obligations thereunder.[6] Absent the Plan, there is significant uncertainty as to whether VAAL would be able to achieve the requisite level of creditor consent to implement the Recapitalization, or any alternative transaction, in time to prevent it from going into formal insolvency proceedings given its deteriorating liquidity position.[7] An English-law administration for the Group is an outcome that would be value-destructive and likely result in lower recoveries for stakeholders.[8] Because VAAL has material assets and operations in the United States, the recognition of the English Proceeding and enforcement of the Sanction Order and the Plan through chapter 15 of the Bankruptcy Code are necessary to ensure that the Plan is effective and binding on all relevant parties.

---

[4]       Explanatory Statement, Part A ¶¶ 8.3-8.5.
[5]       Explanatory Statement, Part A ¶¶ 8.6-8.22.
[6]       Explanatory Statement, Part B ¶ 1.
[7]       Explanatory Statement, Part B ¶ 4.2.
[8]       Explanatory Statement, Part B ¶¶ 4.3-4.17.

B.    **VAAL's Business**

4.    VAAL is incorporated and registered in England and Wales as a private company limited by shares under registered number 01600117.[9]

5.    The Group is a long haul, full-service, omni-channel airline that operates a fleet of 35 aircraft, with two entities in the Group holding an operating license and an air operating certificate issued and subject to regulation by the Civil Aviation Authority. [10] The Group also has seven 747 aircraft which were retired from service in March 2020.[11] Five of these are leased and under agreements due to terminate in 2021, while the remaining two are owned and in the process of being sold.[12] In 2019, it had revenues of approximately £3,000,000,000 and EBITDAR of approximately £340,000,000, and operated over 23,000 flights, served approximately 6,000,000 passengers, and carried over 220,000 tonnes of cargo.[13]

6.    With Delta Air Lines, Inc., the Group is a founding member of a leading $13,000,000,000 transatlantic joint venture that launched in 2014 and was subsequently expanded to include Air France-KLM S.A.[14]

7.    The Group's business is organised into three business segments according to their principal operating activities: (i) Virgin Atlantic, the Group's airline business (**Group Airline**); (ii) Virgin Atlantic Holidays, an industry-leading tour operator business and distribution channel for Group Airline (**Group Tour Operator**); and (iii) Virgin Atlantic Cargo, the Group's international cargo division **(Group Cargo)**.[15]

---

[9]    Explanatory Statement, Part A ¶ 5.1.
[10]    Explanatory Statement, Part A ¶¶ 5.2, 5.8.
[11]    Explanatory Statement, Part A ¶ 5.8.
[12]    *Id*.
[13]    Explanatory Statement, Part A ¶ 5.2.
[14]    Explanatory Statement, Part A ¶ 5.3.
[15]    Explanatory Statement, Part A ¶ 5.5.

8.      Group Airline focuses on hub airports in the United Kingdom and, in 2019, offered flights to 26 destinations from five UK airports—Heathrow, Gatwick, Manchester, Glasgow, and Belfast.[16] It has recently announced plans to close its operations at Gatwick in the short term and consolidate flights at Heathrow, but will retain its Gatwick slots in order to have flexibility as passenger demand increases.[17] It holds the second-largest slot portfolio at Heathrow and, together with its transatlantic joint venture partners, operates 8% of the slots at Heathrow.[18]

9.      The expanded transatlantic joint venture with Delta Air Lines, Inc. and Air France-KLM S.A. offers 340 daily transatlantic flights, 110 non-stop routes, and over 340 destinations between North America and three United Kingdom/European hubs.[19] The partnership provides customers with more convenient flight schedules, enhanced customer benefits such as reciprocal loyalty schemes, and seamless end-to-end journeys for passengers across all four airlines.[20]

10.     Group Tour Operator offers a strategic distribution channel for the Group through its digital and concession focused retail network, serving approximately 400,000 vacationers in 2019.[21] As of February 1, 2020, it operated 57 stores, including concession stores across key parts of the NEXT retail portfolio across the United Kingdom.[22] Group Tour Operator is the number one provider of packaged tours to Orlando, Florida.[23]

11.     Group Cargo supplements Group Airline's passenger operations and accounts for approximately a quarter of all long-haul air cargo capacity to and from the UK and approximately

---

[16]     Explanatory Statement, Part A ¶ 5.6.
[17]     *Id.*
[18]     Explanatory Statement, Part A ¶ 5.9.
[19]     Explanatory Statement, Part A ¶ 5.7.
[20]     *Id.*[21]     Explanatory Statement, Part A ¶ 5.10.
[21]     Explanatory Statement, Part A ¶ 5.10.
[22]     *Id.*
[23]     *Id.*

27% of transatlantic capacity.[24] It focuses on sectors and goods where quality of service and punctuality are highly valued, such as perishables and e-commerce, and provides the Group with flexibility to scale up services in support of revenues during periods of reduced passenger demand.[25] For example, during the COVID-19 crisis, cargo flights have generated approximately £90,000,000 in revenue between April 2020 and June 2020.[26]

12.    As of May 1, 2020, the Group employed approximately 10,300 people, but reduced headcount by approximately in July.[27] The majority of VAAL's directors, officers, and employees are located in England and Wales. VAAL's headquarters and registered office is located in Crawley, England.

## C.    Relevant Liabilities under the Plan

13.    As one component of the Recapitalization, the Plan only affects certain of VAAL's stakeholders, debts, and other obligations, as described with specificity in the Explanatory Statement and summarized at a high level in the following paragraphs. The Plan refers to such parties as "Plan Creditors," and an overview of the Plan treatment for each category of "Plan Creditor" is provided below in Paragraph 35.

### i.    The "RCF Agreement" and the "RCF Plan Creditors"

14.    On January 17, 2018, VAAL, as borrower, entered into an English law-governed multicurrency revolving credit facility with total revolving commitments of USD 150,000,000, which commitments were subsequently increased through an accordion clause to USD

---

[24]    Explanatory Statement, Part A ¶ 5.11.
[25]    *Id*.
[26]    *Id*.
[27]    Explanatory Statement, Part A ¶ 5.4.

280,000,000.[28] The facility is fully drawn.[29] The Plan refers to the facility agreement as the "RCF Agreement" and to the relevant creditors as the "RCF Plan Creditors."

15.    Interest on loans under the RCF Agreement is payable at a floating rate equal to the London Inter-bank Offered Rate or, in relation to any loan in Euro, the Euro Interbank Offered rate, plus margin of 1.75% per annum.[30] To secure VAAL's obligations under the RCF Agreement, VAAL granted first-priority security to Lloyds Bank plc, as security agent, over two Boeing 787-9 aircraft and ten Rolls Royce engines.[31] Fit Leasing Limited, a Group member and subsidiary of VAAL, granted additional security over two Rolls Royce engines.[32]

### ii.    "Operating Lease Arrangements" and "Operating Lessor Plan Creditors"

16.    VAAL leases four Airbus A330-200 aircraft, ten Airbus A333-300 aircraft, and eleven Boeing 787-9 aircraft from a number of aircraft leasing companies.[33] The Plan refers to the relevant lease agreements as "Operating Lease Agreements" and to the relevant creditors as the "Operating Lessor Plan Creditors."

17.    The Operating Lease Agreements have fixed terms and each is currently due to expire on dates between March 2021 and January 2034.[34] In each case, VAAL (i) pays rent for the aircraft on a monthly basis; (ii) is responsible for all costs and risks associated with the possession and operation of the aircraft, including insurance, maintenance, storage, operational costs, and any costs arising from damage or destruction to, or caused by, the aircraft; and (iii) does not have an

---

[28]    Explanatory Statement, Part A ¶ 6.2.
[29]    Explanatory Statement, Part A ¶ 6.6.
[30]    Explanatory Statement, Part A ¶ 6.3.
[31]    Explanatory Statement, Part A ¶ 6.4.
[32]    Explanatory Statement, Part A ¶ 6.7.
[33]    *Id*.
[34]    *Id*.

ownership interest in the aircraft and is required to return the aircraft at the end of the lease term.[35]

The Operating Lease Agreements are largely unsecured, though fourteen of the Operating Lessor

Plan Creditors benefit from an assignment of insurance proceeds granted by VAAL[36] and each

Operating Lessor Plan Creditor has received security deposits from VAAL, in the form of letters

of credit or cash, equivalent to a number of months' rent.[37] The letters of credit may be drawn

following an event of default under the relevant Operating Lease Agreement.[38] The Operating

Lease Agreements also allow the Operating Lessor Plan Creditors to terminate their respective

Operating Lease Agreements and seek repossession of the aircraft and damages following the

occurrence of certain specified events of default.[39] Pursuant to bilateral discussions between

VAAL and each Operating Lessor Plan Creditor, rent deferral arrangements were agreed with all

but one of the Operating Lessor Plan Creditors for varying periods ranging between March 2020

and October 2020.[40]

18.    All of the Operating Lease Agreements are governed by English law.[41] As at June

30, 2020, VAAL had an aggregate future liability of $1,257,037,374.30 for the aircraft under the

Operating Lease Agreements.[42]

### iii.    "Trade Plan Creditors"

19.    VAAL is party to a large number of contracts for the supply of goods, services, and

premises, including, but not limited to, contracts for:

---

[35]    *Id.*
[36]    Explanatory Statement, Part A ¶ 6.8.
[37]    Explanatory Statement, Part A ¶ 6.9.
[38]    *Id.*
[39]    Explanatory Statement, Part A ¶ 6.8.
[40]    Explanatory Statement, Part A ¶ 6.10.
[41]    Explanatory Statement, Part A ¶ 6.7.
[42]    Explanatory Statement, Part A ¶ 6.12.

a.   operational services, including contracts with component suppliers, equipment suppliers, maintenance providers, technical consultants, and cargo service providers;

b.   the supply of services and/or access to facilities required to deliver its flying program both on the ground and in the air, including ground handling, catering, cleaning, in-flight entertainment, baggage tracking, and airport and lounge facilities;

c.   marketing services, including brand tracking, and contracts with marketing agencies, and advertising media providers;

d.   human resource services, including healthcare, resourcing, and recruitment;

e.   financial services, including business processing, professional advice, and insurance; and

f.   the supply of technology, including the Group's business systems and specialist airline software for managing operations data and revenue.[43]

The Plan describes such counterparties as "Trade Plan Creditors." Suppliers typically invoice VAAL periodically for amounts associated with services provided or goods supplied or premises leased to VAAL, and VAAL is generally required to pay amounts owing to each supplier within a specified period from receiving an invoice.[44] Since April 2020, in order to manage liquidity during the ongoing COVID-19 pandemic, VAAL has limited payments to suppliers to the minimum amount required in order to keep operating the business; subjected any payments to a robust internal process to ensure that such payments are approved for only business-critical reasons and are made in only the minimum amount required; engaged in bilateral discussions with certain suppliers in order to, among other things, reduce outstanding amounts owed and/or defer payment of those amounts; and, in some cases, sought to preserve cash by unilaterally stretching payment terms.[45] VAAL has identified 168 Trade Plan Creditors whose claims will be compromised

---

[43]     Explanatory Statement, Part A ¶ 6.16.
[44]     Explanatory Statement, Part A ¶ 6.17.
[45]     Explanatory Statement, Part A ¶ 6.18.

pursuant to the Plan and, as at June 12, 2020, had a liability of £53,989,396.58 owed to the Trade

Plan Creditors.[46] The claims of Trade Plan Creditors that will be subject to the Plan will be

determined based on the liability owed by VAAL, including accrued and unpaid interest claimed

by a Trade Plan Creditor in accordance with the relevant arrangements, with respect to goods or

services rendered prior to 1:30 p.m. on July 14, 2020.[47]

20.    The Plan excludes any suppliers with outstanding claims against VAAL of less than

£50,000 in the aggregate as at June 12, 2020.[48] For reasons explained in detail in the Explanatory

Statement, the Plan also excludes, and VAAL does not seek to compromise the claims of, suppliers

that fall into any of the following categories: (i) airports, governments, or other public bodies that

have claims against VAAL with respect to, among other things, air traffic control charges, air

navigation charges, overflight charges, airport charges, council tax, and business rates; (ii)

insurance companies and brokers that have claims against VAAL with respect to insurance

premiums payable by VAAL and claims under VAAL's insurance policies; (iii) sales agents who

continue to sell air passenger tickets, cargo shipments, and/or package holidays on behalf of the

Group; (iv) any supplier which has already agreed with VAAL discounts of a value equivalent to

or greater than 20% of the amount outstanding as at June 12, 2020; (v) any advisory firm that has

provided and/or continues to provide restructuring advice to VAAL or its creditors in connection

with the Plan and the Recapitalization; (vi) any supplier of goods, services, or infrastructure with

respect to which VAAL has no feasible alternative and where the loss of supply of such goods,

services, or infrastructure would have an immediate and significant impact on safety or VAAL's

operations; (vii) any supplier with contracts that, if terminated, would expose the Company to

---

[46]    Explanatory Statement, Part A ¶ 6.19.
[47]    Explanatory Statement, Part A ¶ 6.19.
[48]    Explanatory Statement, Part A ¶ 6.25.

significant loss disproportionate to the benefits of their inclusion in the Plan; (viii) any company with a contract to supply products for new fleet of aircraft and that has agreed, or has been approached by VAAL to agree, to defer the delivery of such products for a period of two years or more; and (ix) companies that are creditors of VAAL under certain arrangements that are being compromised under the Plan or as part of the Recapitalization.[49]

### iv.    "Connected Party Agreements" and "Connected Party Plan Creditors"

21.    VAAL is also party to a number of agreements with affiliates that will be included in the Plan, including: (i) a trademark license arrangement with VAL TM Limited, under which VAAL has the license to use various "Virgin Atlantic" trademarks and names and is required to pay royalties;[50] (ii) certain contractual arrangements with one of VAAL's indirect shareholders, Delta Air Lines, Inc., in connection with establishing a joint venture, certain transition payments in relation to the joint venture, and various reservation, ticketing, help desk, and related services;[51] and (iii) a £30,000,000 English-law unsecured revolving credit facility provided by Delta Air Lines, Inc. and one of VAAL's subsidiaries, Virgin Holdings Limited, that is fully drawn.[52] The Plan refers to such arrangements as "Connected Party Agreements" and to the relevant creditors as "Connected Party Plan Creditors."

### D.    Assets and Operations in the United States

22.    VAAL has operations and assets in a number of states, with the majority of its U.S. operations and assets in New York, Georgia, Florida, California, and Nevada. Of these locations, New York and Atlanta are the most significant. New York is where VAAL has the most employees

---

[49]    *Id.*
[50]    Explanatory Statement, Part A ¶¶ 6.27-6.35.
[51]    Explanatory Statement, Part A ¶¶ 6.36-6.44.
[52]    Explanatory Statement, Part A ¶¶ 6.45-6.48.

and significant assets, including its principal U.S. bank accounts and engineering assets. Atlanta is where VAAL maintains its U.S. office for administrative functions and also has some engineering assets. In addition , VAAL has a smaller bank account in Colorado and additional engineering assets across ten other states.

## E.    Events Leading to the English Proceeding

23.    The Group and its business have been adversely affected by the ongoing COVID-19 pandemic, which has caused an unprecedented near-shutdown of the global passenger aviation industry.[53] As a result of the pandemic, global airlines have announced large scale cost-cutting and cash preservation initiatives, sought extensive government support and subsidies, and/or have commenced chapter 11 cases, entered administration, or other court-backed restructuring processes.[54] Global aviation was one of the first industries to be impacted by the COVID-19 pandemic and is likely to be one of the last to fully recover.[55]

24.    Since January 1, 2020, the Group's reservations are down 89% year-on-year and current demand for the second half of 2020 is at approximately 25% of 2019 levels.[56] Industry downside forecasts suggest that 2021 passenger demand could fall as low as 50% of 2019 levels.[57]

25.    To address the deterioration in the Group's trading and liquidity position, the Group was the first UK airline to take immediate and decisive steps to manage liquidity, including:

   a.   suspending unprofitable flights and reducing capacity beginning with the suspension of flights to and from Shanghai on January 31, 2020;

   b.   implementing proactive flight cancellations for any cash loss-making flying;

---

[53]    Explanatory Statement, Part A ¶ 8.1.
[54]    *Id*.
[55]    *Id*.
[56]    Explanatory Statement, Part A ¶ 8.2.
[57]    Explanatory Statement, Part A ¶ 8.2.

    c.   taking advantage of surging cargo demand by launching cargo-only flights in April 2020;

    d.   consolidating remaining flights to Heathrow to reduce fixed operational costs;

    e.   continuously monitoring passenger and cargo demand to adjust capacity plans as necessary;

    f.   immediately grounding the A346-600 fleet and the 747-400 fleet;

    g.   securing full voluntary support and commitment from employees and unions to immediately reduce personnel costs;

    h.   the CEO and leadership team reducing their salaries by 20% and 15% respectively from April 2020 to December 2020;

    i.   immediately suspending discretionary overhead spend following supplier cost review;

    j.   fully drawing down available credit facilities;

    k.   securing immediate shareholder support;

    l.   determining a long term forecast for economic recovery from which to build a robust and sustainable business plan; and

    m.   undertaking a rapid strategic business model review that led to the development of a recovery plan, which was announced on May 5, 2020.[58]

26.    Notwithstanding these steps, additional measures are necessary to regain a sustainable capital structure in light of the challenging financial and operating conditions facing the Group.[59] In March 2020, the Group engaged with the government of the United Kingdom and its advisers in relation to both aviation industry wide and company specific direct support.[60] It also engaged with a wide range of stakeholders, including potential third-party investors to raise new capital, and entered negotiations with existing creditors to secure a financial support package with

---

[58]    Explanatory Statement, Part A ¶ 8.3.
[59]    Explanatory Statement, Part A ¶ 8.5.
[60]    Explanatory Statement, Part A ¶ 8.4.

the government as a potential lender of last resort.[61] In connection with these efforts, the Group retained Houlihan Lokey and Allen & Overy LLP as financial and legal advisors and appointed Alvarez & Marsal Europe LLP to carry out contingency planning and to potentially serve as administrators in the event VAAL were to enter administration.[62]

27.    On May 8, 2020, VAAL began to formally engage with its key stakeholders.[63] On May 15, 2020, VAAL gave a presentation to stakeholders that had signed non-disclosure agreements on the unprecedented impact of the COVID-19 pandemic on its business, the extensive actions it had taken to reduce costs, and a five-year plan to resize the Group to emerge from the COVID-19 pandemic as a sustainably profitable airline.[64] Since the presentation, the Group and its advisors have continued to engage in discussions with its stakeholders in order to agree the terms of a recapitalization.[65] In parallel, the Group and its advisors have run an open process to invite third-party investors to provide new financing. On July 2, 2020, VAAL signed a term sheet and binding commitment letter with Davidson Kempner European Partners, LLP for £170,000,000 million of debt financing,[66] and the parties will enter into a new £110,000,000 term loan facility on the effective date of the Recapitalization.[67]

28.    Following extensive negotiations, VAAL and its stakeholders reached an in-principle agreement on the key commercial terms for the Recapitalization, a consensual recapitalization of the Group.[68] The Plan proposed in the English Proceeding is one component of the Recapitalization, the implementation of which by September 3, 2020, will ensure the

---

[61]    *Id.*
[62]    Explanatory Statement, Part A ¶ 8.5.
[63]    Explanatory Statement, Part A ¶ 8.6.
[64]    Explanatory Statement, Part A ¶ 8.7.
[65]    Explanatory Statement, Part A ¶ 8.8.
[66]    Explanatory Statement, Part A ¶ 8.10.
[67]    *Id.*
[68]    Explanatory Statement, Part A ¶¶ 8.11-8.22.

continuing operations of the Group for the benefit of all stakeholders, with the key elements for a

sustainable capital structure and a foundation from which VAAL can deliver long-term value for

all of its stakeholders.[69]

29.     In order to formalize the terms of the in-principle agreement and provide the Group

with some stability during the restructuring process and the confidence required to propose the

Plan, VAAL asked stakeholders to enter into support agreements in order to commit those parties

to negotiate long form documentation and implement the Recapitalization.[70] Generally, the parties

to each support agreement: (i) undertook to take all actions within their power necessary to give

effect to all or any part of the Recapitalization; (ii) confirmed their support for the Recapitalization

and agreed not to take, encourage, assist or support any action which would, or would reasonably

be expected to, breach, delay or be inconsistent with the Recapitalization; (iii) submitted to the

jurisdiction of the courts of England and Wales in respect of any compromise or arrangement used

to implement the Recapitalization; and (iv) agreed to forbear from taking, or from directing or

encouraging any other person to take, any enforcement action, including by delivering a notice of

default or acceleration, as a result of certain suspended defaults, except as permitted or required

under the terms of the Recapitalization.[71] Each support agreement provides the parties thereto with

certain voluntary termination rights, including the right of VAAL or a majority of the creditors

thereunder to terminate by mutual written consent.[72] Each support agreement also ceases to have

effect upon the earliest of: (x) the date it is terminated in accordance with its terms; (y) a long-stop

---

[69]     Explanatory Statement, Part B ¶ 1.1.
[70]     Explanatory Statement, Part A ¶¶ 8.11-8.113.
[71]     Explanatory Statement, Part A ¶ 8.13.
[72]     Explanatory Statement, Part A ¶ 8.15.

date of September 30, 2020, or such later date as may be agreed between VAAL and a majority of its creditors; and (z) the effective date of the Recapitalization.[73]

30.    As of the date the Plan was filed, VAAL had received signatures to, or indications of support for, support agreements from a substantial proportion of its stakeholders.[74] Notwithstanding the significant level of support for the Recapitalization, the Plan is necessary in order for VAAL to restructure each of the arrangements that are proposed to be subject to the Plan.[75]

31.    On July 20, 2020, VAAL's board of directors appointed the Foreign Representative by formal resolution attached hereto as Exhibit B (the **Board Resolution**) to act as the company's foreign representative for the purposes of commencing and prosecuting appropriate proceedings in foreign jurisdictions, including in the United States, ancillary to the English Proceeding. The Board Resolution specifically authorizes and directs the Foreign Representative in its capacity as VAAL's foreign representative to commence this case in support of the English Proceeding and the Plan.

### F.    The English Proceeding and the Plan

32.    Part 26A of the Companies Act, which became law in England and Wales in late June, establishes a process by which a company that has encountered, or is likely to encounter, financial difficulties that are affecting, or will or may affect, its ability to carry on business as a going concern may propose a restructuring plan.[76] Like a chapter 11 plan of reorganization, a restructuring plan enables a company to compromise its obligations to stakeholders.[77] One relevant

---

[73]    Explanatory Statement, Part A ¶ 8.16.
[74]    Explanatory Statement, Part A ¶ 8.20.
[75]    Explanatory Statement, Part A ¶ 5.16.
[76]    Marshall Declaration ¶¶ 12-14.
[77]    Marshall Declaration ¶ 12.

difference is that, like an English scheme of arrangement, a restructuring plan need not involve all of a company's stakeholders and debts or obligations and can be limited to select groups of its creditors and/or members and to the debts or obligations owed to those creditors and/or members.[78] In this case, the Plan restructures, amends, or authorizes VAAL to restructure or amend certain debts and obligations owed to those parties that constitute Plan Creditors and provides for the same treatment for each Plan Creditor as will be received by other similarly situated Plan Creditors. There is no need for any Plan Creditor to file a claim in the English Proceeding to receive the same treatment as other similarly situated Plan Creditors with respect to their rights under the relevant agreements. The process for participating in or objecting to the Plan is the same for creditors of VAAL located in the United States as it is for any other creditor, wherever located in the world. The Plan does not restructure or amend debts and obligations owed to other stakeholders of VAAL, including creditors that are not Plan Creditors. As such, creditors of VAAL that are not Plan Creditors will not be affected by the Plan and no distributions of VAAL's assets will be made on account of claims filed and processed in the English Proceeding.

33.    On July 14-15, 2020, a Practice Statement Letter was sent to Plan Creditors to provide them notice of the Plan, VAAL's intention to commence a proceeding in respect of the Plan with the English Court, and the date of the hearing before the English Court to seek an order granting VAAL permission to convene meetings of Plan Creditors. The Practice Statement Letter was provided to RCF Plan Creditors directly and via their agent, and to each other Plan Creditor directly. On July 20, 2020, VAAL circulated a supplement to the Practice Statement Letter reflecting certain changes to the Plan, including the removal of certain classes. Such documents were distributed via email to the extent practicable and were also made available to Plan Creditors

---

[78]    Marshall Declaration ¶¶ 12-13.

on a website at www.lucid-is.com/virginatlantic. Notice of the Plan Meetings and of the hearing before the English Court seeking entry of the Sanction Order will be provided in substantially the same manner.

34.    On July 30, 2020, papers pertaining to the Plan were filed with the English Court. On August 4, 2020, the English Court entered an order (the **Convening Order**) which, among other things: (i) granted VAAL permission to convene meetings of Plan Creditors to consider the approval of the Plan; (ii) appointed the Foreign Representative; and (iii) authorized the Foreign Representative to commence this chapter 15 case in order to seek recognition and relief in the United States in respect of the English Proceeding. The Plan Creditor meetings are currently scheduled to begin at 2:00 p.m. (London time) on August 25, 2020, with a separate meeting for each of the following classes of Plan Creditors: (i) "RCF Plan Creditors," (ii) "Operating Lessor Plan Creditors," (iii) "Trade Plan Creditors," and (iv) "Connected Party Plan Creditors."

35.    The Plan will amend the claims of Trade Plan Creditors and grant VAAL a power of attorney authorizing it to enter into certain documents on behalf of Plan Creditors to amend the agreements between the Plan Creditors and VAAL to further the implementation of the Recapitalization. Summarized at a high level and subject to the more detailed discussion in Part B, Section 2 of the Explanatory Statement, the Plan provides for the following amendments to VAAL's arrangements with each class of Plan Creditors:[79]

    a.    *The RCF Agreement.* The RCF Agreement will be amended to, among other things: convert from a revolving credit facility to a term loan facility; extend the maturity date; alter the repayment provisions and schedule; and increase the margin. Certain events of default will also be waived.[80]

---

[79]    Many of the amendments in the Plan are keyed off of or refer to the following key dates in the Plan process: (i) the "Plan Effective Date," the date a copy of the Sanction Order is delivered to the Registrar of Companies for England and Wales; and (ii) the "Recapitalisation Effective Date," the date VAAL notifies Plan Creditors and other affected stakeholders that the Recapitalization has been completed.

[80]    Explanatory Statement, Part B ¶¶ 2.1-2.3.

b.  *Operating Lease Agreements.* Each Operating Lessor Plan Creditor may elect, or be deemed to elect in certain circumstances, one of three alternative treatments: (i) the deferral and capitalization of a portion of each rent payment as it comes due, and repayment of the deferred amounts in 48 equal monthly installments commencing on January 1, 2022; (ii) a permanent reduction to the amount of rent, the deferral and capitalization of the entirety of each rent payment as it comes due, and a single repayment of the deferred amount at the expiration of the lease; or (iii) the termination of the lease and repossession of the aircraft. Certain events of default will also be waived.[81]

c.  *Trade Plan Creditors.* The arrangements in place with the Trade Plan Creditors will be amended such that amounts owed to Trade Plan Creditors for goods delivered or services performed prior to 1:30 PM (London time) on July 14, 2020, will be reduced by 20%, with (i) 10% of the balance to be paid shortly following the Recapitalisation Effective Date and (ii) the remainder to be paid in in equal quarterly installments from December 31, 2020, through September 30, 2022, including interest accruing on such amounts at a rate of 1% per annum.

In addition, the Trade Plan Creditors will waive any defaults, events of default, or other breaches by VAAL of the Trade Creditor Agreements and any consequences thereunder existing as at or arising before the Plan Effective Date (the Plan will not, however, prevent landlords of VAAL from exercising any rights of forfeiture or re-entry that they may have, unless a landlord votes in favor of the Plan or otherwise accepts the compromise set out in the Plan).[82]

d.  *Connected Party Agreements.* In the case of Connected Party Plan Creditors, (i) all accrued and unpaid amounts due and payable as at the Recapitalisation Effective Date will be capitalized in exchange for the issuance of preference shares and (ii) all accrued and unpaid amounts that become due and payable during the "Capitalisation Period" under the Plan shall be capitalized in exchange for the issuance of preference shares on December 31 of each year. The Plan defines the "Capitalisation Period" as the period between January 1, 2020, and the earlier of (y) January 17, 2026 and (z) the date certain other obligations of VAAL are paid in full. Certain events of default will also be waived.[83]

36.  Under English law, in order for the Plan to become legally valid and binding, the

following formal requirements must generally be satisfied: (i) requisite approval by Plan Creditors;

---

[81]   Explanatory Statement, Part B ¶¶ 2.4-2.10.
[82]   Explanatory Statement, Part B ¶¶ 2.11-2.13.
[83]   Explanatory Statement, Part B ¶¶ 2.14-2.16.

(ii) the English Court's entry of the Sanction Order sanctioning the Plan; and (iii) the delivery of the Sanction Order to the Registrar of Companies for England and Wales.[84] The requirements for Plan Creditor approval of the Plan are comparable to, and are in some respects more stringent than, the requirements for plan approval under chapter 11 of the Bankruptcy Code.

37.     In order for a class of Plan Creditors to accept the Plan, the Plan must be approved by Plan Creditors representing at least 75% in value of the claims held by such Plan Creditors present in person or by proxy and voting at the relevant meeting.[85] There is no numerosity requirement.[86] One means of approval is for the Plan to be accepted by every class of Plan Creditors.[87] If a class of Plan Creditors does not accept the Plan, i.e., there is a dissenting class, the English Court can nevertheless sanction the Plan if none of the members of the dissenting class would be worse off than under the alternative and the Plan is approved by at least one class of Plan Creditors that would receive a payment, or have a genuine economic interest, under such alternative.[88] The Plan also cannot be sanctioned by the English Court unless the English Court is satisfied, among other things, that the Plan is fair and the classes of creditors and/or members voting in respect of the Plan have been properly formed[89] (in general, the stakeholders within a class must be similarly situated so that their interests are not so dissimilar as to make it impossible to consult with a view to their common interest).[90]

38.     In connection with the recognition of the English Proceeding, the Foreign Representative also requests that the Court give full force and effect to the Sanction Order and the

---

[84]     Marshall Declaration ¶¶ 17, 19.
[85]     Marshall Declaration ¶ 17.
[86]     *Id*.
[87]     *Id*.
[88]     *Id*.
[89]     Marshall Declaration ¶ 25.
[90]     Marshall Declaration ¶ 15.

Plan in the United States. In the interests of time and efficiency, this chapter 15 case has been commenced prior to the Plan Creditor meetings and the entry of the Sanction Order so that the two proceedings can proceed in parallel and the Court can consider enforcement as soon as possible after the English Court approves the Plan in the English Proceeding. The Foreign Representative's request that this Court enforce the Sanction Order and the Plan is therefore contingent on the entry of the Sanction Order and, implicitly, the approval of Plan Creditors. To the extent practicable, the Foreign Representative will file updates on the Plan approval process in this case so that the Court has all necessary information prior to the hearing on the disposition of the Chapter 15 Petition.

39.     After the Plan becomes effective, VAAL will enter into a "Recapitalisation Implementation Deed" on behalf of itself and each of the Plan Creditors pursuant to the authority granted to it under the Plan. The Recapitalisation Implementation Deed will, once executed and dated, oblige the parties thereto to enter into documents necessary to effect amendments to their existing agreements with the Group. The effectiveness of such amendments would be subject to, among other conditions precedent, the entry of an order in this case giving full force and effect to the Plan in the United States.

## **RELIEF REQUESTED**

40.     By this Chapter 15 Petition, the Foreign Representative seeks the following relief:

a.  recognition, pursuant to section 1517 of the Bankruptcy Code, of the English Proceeding as a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code;

b.  all relief afforded to foreign main proceedings automatically upon recognition pursuant to section 1520 of the Bankruptcy Code, including, without limitation, application of the stay imposed by section 362 of the Bankruptcy Code, provided that such stay shall be limited to Plan Creditors;

c.  enforcement of the Sanction Order and the Plan in the United States pursuant to sections 105(a), 1507, and 1521 of the Bankruptcy Code; and

d.  such other and further relief as is appropriate under the circumstances pursuant to sections 105(a), 1507, and 1521 of the Bankruptcy Code.

## **BASIS FOR RELIEF**

### A.  **Recognition of the English Proceeding**

41.    For the reasons more fully discussed in the Memorandum of Law, the English Proceeding is entitled to recognition under section 1517 of the Bankruptcy Code because:

a.  the English Proceeding is: (i) a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code and (ii) pending where VAAL has the "center of its main interests" and is therefore a "foreign main proceeding" within the meaning of section 1502(4), in satisfaction of section 1517(a)(1);

b.  the Foreign Representative is the duly appointed "foreign representative" of VAAL within the meaning of section 101(24) of the Bankruptcy Code and a "person" within the meaning of section 101(41), in satisfaction of section 1517(a)(2); and

c.  the case was properly commenced in accordance with sections 1504 and 1509 of the Bankruptcy Code and the Chapter 15 Petition meets the requirements of sections 1504 and 1515, in satisfaction of section 1517(a)(3).

42.    Recognizing the English Proceeding would not be manifestly contrary to the public policy of the United States, as prohibited by section 1506 of the Bankruptcy Code. In fact, granting recognition will promote the United States public policy of respecting foreign proceedings as articulated in, *inter alia*, sections 1501(a) and 1508 of the Bankruptcy Code and further cooperation between courts to the maximum extent possible as mandated by section 1525(a) of the Bankruptcy Code. Thus, the conditions for mandatory recognition of the English Proceeding under section 1517 of the Bankruptcy Code are satisfied.

43.    Under section 1520 of the Bankruptcy Code, upon recognition of the English Proceeding as a "foreign main proceeding" section 362 of the Bankruptcy Code would automatically take effect with respect to VAAL and the property of VAAL within the territorial

jurisdiction of the United States. Because the Plan only purports to bind Plan Creditors, however, the Foreign Representative requests the application of the automatic stay in this case be limited to Plan Creditors.

**B.      Enforcement of the Sanction Order and the Plan**

44.      In connection with the recognition of the English Proceeding as a "foreign main proceeding" and subject to the English Court's entry of the Sanction Order, the Foreign Representative also seeks the enforcement of the Sanction Order and the Plan in the United States.

45.      Section 1507 of the Bankruptcy Code provides that, "if recognition is granted," a court "may provide additional assistance to a foreign representative under this title or under other laws of the United States." 11 U.S.C. § 1507. Similarly, section 1521(a) of the Bankruptcy Code provides that, upon recognition of a foreign proceeding, and "where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of any creditors, the court may grant any appropriate relief . . . ." 11 U.S.C. § 1521. Such relief includes, among other things, "granting any additional relief that may be available to a trustee," with certain exceptions that are not relevant here. *Id*. Finally, section 105(a) of the Bankruptcy Code allows the Court to "issue any order . . . necessary or appropriate to carry out the provisions of [title 11]."

**46.**      The Sanction Order is analogous to a plan confirmation order, and the Plan is analogous to a plan of reorganization, in a chapter 11 case. As such, the two documents are the key operative restructuring documents and their enforcement in connection with the recognition of the English Proceeding is necessary to give full effect to the English Proceeding in the United States. Moreover, the requirements for stakeholder approval of the Plan and the entry of the Sanction Order are similar to those that would apply to the approval and confirmation of plans of reorganization under the Bankruptcy Code. This Court should therefore give full force and effect

in the United States to the Sanction Order and the Plan under well-established principles of

international comity and pursuant to sections 105(a), 1507, and 1521 of the Bankruptcy Code.

## CONCLUSION

WHEREFORE, the Foreign Representative respectfully requests that this Court grant the

Chapter 15 Petition and enter the Proposed Order recognizing the English Proceeding as a "foreign

main proceeding," enforcing the Sanction Order and the Plan in the United States, and granting

such other relief as is appropriate under the circumstances.

Dated: New York, New York
      August 4, 2020

By: /s/ Ken Coleman
Ken Coleman
Jonathan Cho
Joseph Badtke-Berkow
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:    (212) 610-6300
Facsimile:    (212) 610-6399
ken.coleman@allenovery.com
jonathan.cho@allenovery.com
joseph.badtke-berkow@allenovery.com

*Counsel to Shai Weiss, as the Foreign
Representative of Virgin Atlantic Airways
Limited*

DocuSign Envelope ID: 6350A932-9E68-4B3E-BE94-CE7A94C1B7E7

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, Shai Weiss declares as follows:

I am the Chief Executive Officer and duly authorized agent of Virgin Atlantic Airways Limited and have been appointed and authorized to act as foreign representative of Virgin Atlantic Airways Limited. I have full authority to verify the foregoing *Verified Petition for Recognition of Foreign Proceeding and Motion for Ancillary Relief*.

I have read such document, and am informed and do believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of August 2020, in London


_____

**EXHIBIT A**

Proposed Order

**EXHIBIT B**

Board Resolution