**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| VIRGIN ATLANTIC AIRWAYS LIMITED,[1] | Case No. 20-_____ (___) |
| Debtor in a Foreign Proceeding. | |

**DECLARATION OF JENNIFER MARSHALL AS ENGLISH COUNSEL IN SUPPORT OF (I) VERIFIED PETITION FOR RECOGNITION OF FOREIGN PROCEEDING AND MOTION FOR ANCILLARY RELIEF AND (II) *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PROVISIONAL RELIEF**

Pursuant to 28 U.S.C. § 1746, I, **JENNIFER MARSHALL**, declare under penalty of perjury under the laws of the United States of America, that, based upon my knowledge, information, and belief as set forth herein, the following are true and correct:

## BACKGROUND

1.      I am a person of the full age and majority, I have never been convicted of a felony or any crime involving moral turpitude, and I am competent to make this declaration.

2.      I am a Partner in the law firm of Allen & Overy LLP, in London, England, counsel to Virgin Atlantic Airways Limited (the **VAAL**) and Shai Weiss, in his capacity as the duly authorized foreign representative (the **Foreign Representative**) of VAAL. I joined the firm in 1997 and became a partner in 2006.

3.      I am a member in good standing of the Solicitors Regulatory Authority and have been either with the Solicitors Regulatory Authority or its predecessor, the Law Society, since I qualified as a solicitor in 1997. I have practiced law as an English qualified solicitor with Allen & Overy LLP since 1997 following the completion of my training contract with Denton Wilde Sapte. I have

---

[1] The last four digits of the United States Tax Identification Number, or similar foreign identification number, as applicable, for Virgin Atlantic Airways Limited are 3123.

specialized in restructuring and insolvency since qualifying, with a particular emphasis on banking and financial transactions and security arrangements in relation to the same.

4.      A copy of my professional resume is attached to this Declaration as <u>Exhibit A</u>.

5.      I submit this declaration (the **Declaration**) in support of the *Verified Petition for Recognition of Foreign Proceeding and Motion for Ancillary Relief* (the **Petition**) and the *Ex Parte Application for Temporary Restraining Order and Motion for Provisional Relief* (the **Provisional Relief Motion**), filed contemporaneously herewith.

6.      As of the date hereof, VAAL is the subject of proceedings (the **English Proceeding**) currently pending before the High Court of Justice of England and Wales (the **English Court**), concerning a "restructuring plan" (the **VAAL Plan**), pursuant to Part 26A of the Companies Act 2006 (as modified, amended or re-enacted from time to time, the **Companies Act**). The English Proceeding is the first proceeding of which I am aware in which a company seeks to avail itself of a restructuring plan.

7.      The Petition seeks, among other relief, entry of an order (i) granting recognition of the English Proceeding as a "foreign main proceeding" pursuant to chapter 15 title 11 of the United States Code (the **Bankruptcy Code**) and (ii) subject to the English Court's entry of a sanction order sanctioning the VAAL Plan (the **Sanction Order**), giving full force and effect in the United States to the Sanction Order and the VAAL Plan. The Provisional Relief Motion seeks entry of an order prohibiting certain parties from terminating or modifying their contracts with VAAL on certain grounds pending the final disposition of the Petition.

8.      VAAL's headquarters and principal place of business is in Crawley, West Sussex, England.

9.      In preparing this Declaration, I reviewed (a) the Petition and the Provisional Relief Motion and (b) relevant provisions of the Companies Act, and other provisions of English law and

the laws of the European Union as they relate to chapter 15 of the Bankruptcy Code and other aspects of U.S. bankruptcy law. All facts set forth in this Declaration are based on: (a) my knowledge; (b) my review of relevant documents; or (c) my opinion based upon my experience and knowledge of the VAAL's operations. If called upon to testify, I could and would testify competently to the facts set forth herein.

10.    This Declaration comprises matters that are statements of legal opinion and/or statements of fact. Where the matters stated in this Declaration are statements of legal opinion, such statements represent my view of English law as a practicing lawyer admitted and licensed to practice in England and Wales. Where the matters stated in this Declaration are statements of fact that are within my personal knowledge, they are true. Where the matters stated in this Declaration that are statements of fact are not within my personal knowledge, they are derived from documents or information supplied to me by or on behalf of VAAL and are true to the best of my knowledge, information, and belief.

11.    In this Declaration, I provide a description of English law and practice relevant to this Court's consideration of the Petition and the Provisional Relief Motion. Thereafter, I also summarise the procedures and schedule of events relating to the VAAL Plan currently underway with respect to VAAL.

## STATEMENTS OF ENGLISH LAW AND PRACTICE

### A. English Restructuring Plan

12.    A new Part 26A of the Companies Act was introduced into the laws of the United Kingdom by the Corporate Insolvency and Governance Act 2020 which came into effect on 26 June 2020. A true and correct copy of Part 26A is attached to this Declaration as Exhibit E. Part 26A allows English companies (and certain foreign companies) to use a new statutory tool known as a "restructuring plan" to impose a compromise or arrangement (including restructuring of liabilities)

agreed with a statutory majority of the company's creditors or members (or any class of creditors or members) upon each and every creditor or member of the relevant class subject to the restructuring plan, provided that certain conditions are met. The restructuring plan is largely based on the well-known, existing "scheme of arrangement" procedure under Part 26 of the Companies Act with the main difference being that, for a scheme of arrangement, each and every class of creditors or members that is subject to the scheme needs to vote in favour of the scheme whereas a restructuring plan can bind dissenting classes provided that certain conditions are met.

13.     As with a scheme of arrangement, the restructuring plan can be commenced by a company, a creditor or member of a company, a liquidator of a company being wound up, or an administrator of a company in administration. In this case, the restructuring plan was commenced by VAAL. The applicant begins with the preliminary step of circulating a letter (known as a "practice statement letter") to the creditors or members who will be subject to the compromise or arrangement contemplated by the proposed restructuring plan. Among other things, the practice statement letter will typically set out the applicant's proposed classes and the applicant's case for why the English court has jurisdiction for the restructuring plan.  The practice statement letter will notify the recipient creditors and members that they have the right to attend the court hearings for the restructuring plan and to object.

14.     Unlike a scheme of arrangement, there is an additional financial condition that must be satisfied in order for a company to be subject to a restructuring plan. The additional condition is that:

(i)      the company has encountered, or is likely to encounter, financial difficulties that are affecting, or will or may affect, its ability to carry on business as a going concern; and

(ii)     the purpose of the compromise or arrangement is to eliminate, reduce or prevent, or mitigate the effect of, any of those financial difficulties.

15.     The restructuring plan begins when an application is made to the English Court in accordance with Part 26A of the Companies Act requesting permission for a hearing (known as a "convening hearing") to convene meetings of each class of the company's creditors or members proposed to be subject to the restructuring plan to enable them to consider and vote on the proposed compromise or arrangement. Under English law, creditors or members of a company will form a class for the purpose of voting on the restructuring plan if those creditors' or members' rights against the company, both before and after the compromise or arrangement in the proposed restructuring plan is implemented, are not so dissimilar as to make it impossible for them to consult together in relation to the proposed compromise or arrangement with a view to their common interest taking into account, among other things, the relevant alternative (discussed below). The applicant for the restructuring plan will propose the classes of creditors and members to the English Court as part of its convening hearing application, but the decision as to whether or not the class constitution is correct is ultimately one for the English Court.  Creditors and members are entitled to attend the convening hearing to voice any concerns regarding the proposed restructuring plan, including the composition of the proposed class or classes.

16.     The restructuring plan application is supported by a witness statement and a draft explanatory statement, which is the disclosure document for creditors or members (described below in more detail). At the convening hearing, the English Court will decide whether to grant the applicant permission to convene meetings of the relevant class(es) to consider and vote upon the proposed compromise or arrangement. In making its decision, the English Court will consider jurisdictional issues as well as review the composition of the proposed voting class or classes. It will also consider any application by the applicant to exclude, from the effects of the restructuring plan, any class of creditors or members where the English Court is satisfied that none of the members of that class has a "genuine economic interest" in the company (section 901C(4)). This expression is not defined for the purposes

of section 901C(4) and there is only a brief mention of the expression in the "Explanatory Notes"[2] prepared by the UK Government to assist readers of the primary legislation where the expression is said to refer to an "out of the money" class. The English Court may take into account the meaning given to a similar expression in the context of cross-class cram-down (see para 17 below). If the English Court does grant the application to convene the meetings, it will issue an order authorizing the applicant to convene the restructuring plan meeting(s).

17.    The restructuring plan will become legally binding on the company and on all the creditors or members in the relevant class(es) if sanctioned by the English Court at a second court hearing (referred to as the "sanction hearing"). The English Court may only sanction the restructuring plan if:

(i)    a number representing 75% in value of each class of creditors or members, present and voting in person or by proxy, vote in favour of the restructuring plan at the meeting for that class (note that, unlike the scheme of arrangement, there is no requirement for 50% by number of that class to approve the restructuring plan); or

(ii)    one or more classes of creditors or members does not approve the restructuring plan in accordance with the voting threshold referred to above, the English Court is satisfied that: (a) none of the members of the dissenting class would be any worse off than they would be in the event of the "relevant alternative" (as to which see below); and (b) the compromise or arrangement has been agreed by one class of creditors or members who would receive a payment, or have a "genuine economic interest" in the company, in the event of the "relevant alternative". Again, the expression "genuine economic interest" is not defined but it is clear from this provision that the English Court must take into account whether the class would have an economic interest (or would receive a payment) in the event of the "relevant

---

[2] The Explanatory Notes can be found at: https://www.legislation.gov.uk/ukpga/2020/12/pdfs/ukpgaen_20200012_en.pdf.

alternative" (see below). This is referred to as the "cross-class cram-down mechanism" and is the principal new feature of the restructuring plan, compared with the existing scheme of arrangement.

18.     The "relevant alternative" is whatever the English Court considers would be most likely to occur in relation to the company if the compromise or arrangement were not sanctioned by the English Court. The company will provide evidence to the English Court as to what the relevant alternative is likely to be and, typically, this will be an insolvency proceeding such as a liquidation or administration of the company.

19.     A restructuring plan will only become effective when a copy of the order of the English Court sanctioning the restructuring plan is delivered to the Registrar of Companies in England and Wales.

20.     Under section 901A(4) of the Companies Act, the English Court has jurisdiction to sanction a restructuring plan in relation to any company liable to be wound up under the Insolvency Act 1986. This captures companies registered under the Companies Act in England and Wales, such as VAAL. In relation to schemes of arrangement, a number of cases have raised the question of whether it is also necessary for the English Court to be satisfied that it has jurisdiction under the recast Regulation (EU) 1215/2012 of the European Parliament and of the Council on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (the **Recast Judgments Regulation**)[3] and it is likely that the same jurisprudence would apply in relation to the restructuring plan. The Recast Judgments Regulation provides that any person domiciled in an EU member state (other than Denmark) should be sued in the courts of that member state, unless certain exceptions apply. As it has yet to be definitively judicially determined whether schemes of arrangement (and, by

---

[3] The Recast Judgments Regulation is available at: https://eur-lex.europa.eu/eli/reg/2012/1215/2015-02-26.

analogy the restructuring plan) fall within the ambit of the Recast Judgments Regulation, the English Court has adopted the practice of considering whether the English Court nonetheless has jurisdiction under the Recast Judgments Regulation in schemes involving a company and/ or creditors domiciled in member states other than England and Wales, either on the basis of Article 8 of the Recast Judgments Regulations, which allows a person domiciled in one member state to be sued in the courts of another member state if the action involves a number of closely connected claims and it is expedient to determine them together, or on the basis of Article 25 of the Recast Judgments Regulation, which allows parties to be sued in any member state regardless of their domicile if they have agreed that the courts of that member state are to have jurisdiction in respect of any disputes arising in connection with a particular legal relationship. The English Court must also be reasonably assured that the scheme will be recognised and given effect in each relevant foreign jurisdiction where the company (and any obligors that will be released from their obligations pursuant to the scheme) has material assets. It is assumed that the English Court will apply the same approach in relation to the restructuring plan.

21.    Once the convening order is issued, notice of the restructuring plan meeting(s) must be given to all creditors and members who are to be affected by the restructuring plan prior to the meeting(s) in accordance with the convening order. Such notice must be accompanied by the explanatory statement containing sufficient information regarding the company and the effects of the proposed compromise or arrangement so as to allow a typical creditor or member to make a reasonable decision regarding whether or not to support the proposed scheme. I understand that the explanatory statement is comparable to the disclosure statement required under section 1125 of the Bankruptcy Code for solicitation of votes on a chapter 11 plan. Restructuring plan creditors and members are entitled to attend the meetings in person or by proxy and to ask questions regarding the proposed restructuring plan.

22.     As noted above, each class of restructuring plan creditors and members will consider and vote on the proposed restructuring plan separately. As referred to above, a number representing at least 75% in value of those present and voting in person or by proxy at the relevant meeting must vote in favour of the restructuring plan in order for that class to approve the restructuring plan. However, the English Court may still sanction the restructuring plan, even if there is one or more dissenting classes, so long as the conditions referred to above are satisfied. In other words, non-consenting restructuring plan creditors can be bound by the terms of the restructuring plan if (a) they are within a class voting in favour of the restructuring plan; or (b) they are in a dissenting class where the conditions for "cramming down" a dissenting class are met.

23.     The voting majorities are confirmed by a chairman appointed for the purposes of the restructuring plan meeting(s). To confirm the voting majorities, the chairman (often with the assistance of an agent appointed specifically to assist the company with this task) tabulates the votes of creditors and members submitted. The value of each claim for voting purposes will typically be the face value of the actual and contingent claim of that creditor or member against the company under the existing documents as at a specific date fixed prior to the restructuring plan meetings. If the requisite majorities of attending and voting creditors and members approve the restructuring plan, the chairman provides a sworn statement to the court as evidence of the result.

24.     Following the restructuring plan meetings, the company will apply to the English Court to sanction the restructuring plan at a second hearing, which is referred to as a "fairness hearing" or "sanction hearing", to determine whether the English Court should "sanction" the restructuring plan and make the compromise or arrangement binding on all of the creditors and members, whether or not they voted in favour of the restructuring plan. I understand that the sanction hearing is comparable to a confirmation hearing on a chapter 11 plan of reorganization under section 1128 of the Bankruptcy Code. All creditors and members who are affected by the restructuring plan have an

opportunity to raise questions and objections to the restructuring plan and present evidence at the sanction hearing.

25.    The English Court may sanction the restructuring plan unconditionally, may sanction the restructuring plan conditional upon certain modifications or amendments to the restructuring plan, or may refuse to sanction the restructuring plan. The use of the word "may" in section 901F makes clear that the English Court has a discretion regarding whether or not to exercise the restructuring plan but Part 26A does not specify the factors that the English Court will take into account when deciding whether or not it should exercise that discretion. However, paragraph 190 of the Explanatory Notes to the Corporate Insolvency and Governance Act 2020[4] suggests that the English Court has absolute discretion and will draw on the "well-established principles" that apply in relation to schemes of arrangement. This would include considering whether:

(i)    the compromise or arrangement proposed by the restructuring plan is such that an intelligent and honest person, being a member of the relevant class of creditors or members concerned and acting in respect of his interests, might reasonably approve;

(ii)    the restructuring plan is fair, taking into account the interests of the creditors or members, the nature of the restructuring plan's impact upon dissenting creditors or members (or dissenting classes of creditors or members), and whether each class was fairly represented by those attending the meeting(s) including that the statutory majority are acting bona fide and are not coercing the minority in order to promote interests adverse to those of the class whom they purport to represent; and

(iii)    the applicable statutory and procedural requirements have been fulfilled, including whether the requisite majorities of voting creditors and members approved the restructuring plan and, where one or more classes of creditors or members dissents, whether the conditions

---

[4] Available at: https://www.legislation.gov.uk/ukpga/2020/12/pdfs/ukpga_20200012_en.pdf.

referred to above have been satisfied. Indeed, it is likely that there will be more scrutiny from the English Court where there are dissenting classes.

26.     If the English Court sanctions a restructuring plan, the restructuring plan will only take effect once a certified copy of the English Court's order sanctioning the restructuring plan, known as a sanction order, has been delivered to the Registrar of Companies of England and Wales. Upon such delivery, the restructuring plan is binding and effective according to its terms on all creditors and members, irrespective of notice and their participation at any meeting.

**B.  English ipso facto provisions**

27.     Another provision introduced into the United Kingdom insolvency laws by the Corporate Insolvency and Governance Act 2020 on 26 June 2020 is the so-called "ipso facto" prohibition which prevents the supplier of certain goods and services from being able to terminate the supply contract (or to exercise other contractual rights) solely by reason of the company becoming subject to certain insolvency proceedings. This provision was introduced by adding a new section 233B to the UK Insolvency Act 1986. A true and correct copy of section 233B is attached to this Declaration as Exhibit F.

28.     Prior to the introduction of section 233B, there were already protections for:

(i)     the supplies of utilities (i.e. gas, electricity and water) (section 233 of the Insolvency Act 1986[5]); and

(ii)     the supply of "essential" goods or services which are defined as certain data or IT services including communications provided by a public electronic communications service or supplies for the purposes of enabling or facilitating anything to be done by electronic means (such as point of sale terminals, computer hardware and software, data storage and processing and website hosting) (section 233A of the Insolvency Act 1986).

---

[5]     The UK Insolvency Act 1986 is available at: https://www.legislation.gov.uk/ukpga/1986/45.

29.     These protections (which remain in force after the introduction of the new section 233B) prevent the supplier of such utilities or essential supplies from making it a condition of giving the supply following the commencement of certain specified insolvency proceedings that any pre-insolvency, outstanding charges are paid. Furthermore, in the case of "essential" goods and services, the supplier is not able to exercise a contractual termination clause which is triggered by the commencement of an administration[6] or company voluntary arrangement[7] of the company nor is it entitled to exercise such a contractual termination clause because of an event that occurred before the company enters administration or the voluntary arrangement takes effect. Section 233A also provides that a contractual provision allowing the supplier to "do any other thing" because the company enters administration or a voluntary arrangement takes effect is not effective. Neither section 233 nor 233A prevent a supplier from terminating a contract as a result of a default (such as a payment default) arising after the commencement of an administration or voluntary arrangement.

30.     The UK government considered that sections 233 and 233A did not go far enough and that the protections for supply contracts should be extended beyond utilities and IT services and so a new section 233B has now been introduced into the Insolvency Act 1986. This section prohibits the termination of any contract for the supply of goods and services (with certain exclusions as referred to below) or the "doing of any other thing" in respect of that contract, by reason of the company entering into an "insolvency procedure", unless the company or the insolvency officeholder consents[8]. Automatic termination clauses that are triggered by the commencement of an "insolvency

---

[6]      Administration is the main corporate rehabilitation proceeding under English law involving the appointment of an insolvency practitioner referred to as an "administrator" who takes over the running of the business under the protection of a statutory moratorium.

[7]      A company voluntary arrangement is a debtor-in-possession proceeding under Part 1 of the Insolvency Act 1986 allowing the company to put together a composition or arrangement with its creditors. Unlike the scheme of arrangement under Part 26 of the Companies Act, a company voluntary arrangement does not require creditors to be divided into classes and it cannot bind secured or preferential creditors without their express consent.

[8]      The supplier can also apply to the English Court for a "hardship order" allowing it to terminate the supply contract if it can show that the continuation of the contract would cause the supplier hardship although this expression is not defined in section 233B. There is also a temporary exemption for small company suppliers where their counterparty became subject to an insolvency procedure before 30 September 2020, with this date being subject to possible extension. A company is a small company supplier if it meets at least two of the following tests: (i) turnover not more than £10.2 million; (ii) balance sheet total not more than £5.1 million; and (iii) no more than 50 employees.

procedure" are also ineffective. An "insolvency procedure" includes a wide range of English insolvency proceedings including (of relevance to VAAL) where a convening order is made by the English Court in respect of a restructuring plan.

31.    Section 233B therefore has the effect that any contractual termination rights that are triggered by (amongst other events) the convening order permanently cease to have effect unless the company consents[9]. The "any other thing" language appears to be extremely broad and could capture any contractual rights (such as a right to charge default interest or to accelerate a contract) triggered by or exercisable upon the commencement of an "insolvency procedure" (including the convening order); any such rights will also permanently cease to have effect unless the company consents.

32.    Furthermore, if the supplier had a right to terminate the contract or supply on grounds other than the commencement of the particular insolvency procedure (for example, non-payment) *before* the company became subject to an insolvency procedure but did not exercise that right, the supplier may not terminate for that reason during the insolvency period. Therefore, if a supplier does not exercise its rights in relation to a pre-insolvency default, it will temporarily lose that right once the insolvency procedure has commenced. The drafting is very broad and would suspend a counterparty exercising any contractual right to terminate that arose pre-insolvency procedure including, for example, a right to terminate for fraud or wilful default. In that situation, a counterparty would require company or office-holder consent, or a hardship order from the court, before it could terminate the contract. However, if a new termination right arises *after* the commencement of the particular insolvency procedure (for example as a result of a payment default in respect of a payment that falls due after the commencement of the insolvency procedure), the supplier will be able to terminate based on that event of default.

---

[9]        There is no insolvency officeholder in the case of a restructuring plan so the consent would have to come from VAAL in this case.

33.    There are exclusions from the effects of section 233B for certain types of entity and certain types of contract:

(i)    The excluded entity provisions apply where either the insolvent entity is an excluded entity or where the supplier is an excluded entity. VAAL in this case is not an excluded entity but some of its suppliers may well be. The list is a long one and includes deposit-taking and investment banks and insurance companies, electronic money institutions and payment institutions, operators of payment systems, recognised investment exchanges, securitisation companies and overseas companies performing similar functions.

(ii)    In addition, financial contracts are also excluded from these provisions and can continue to be terminated or varied on the grounds of insolvency. Again, the list is extensive and includes loan agreements, financial leasing, swap agreements and derivatives, securities financing transactions and capital market investments (i.e. secured and unsecured bonds). There is also a carve-out for any set-off or netting arrangement or creditors who have a registered interest under the International Interests in Aircraft Equipment (Cape Town Convention) Regulations 2015. This means (for example) that lenders will be permitted to draw-stop facilities, accelerate loans, charge default interest, exercise contractual set-off rights and otherwise exercise their contractual rights associated with an event of default under the facility. Although intercreditor agreements are not included, it is hard to see how these are contracts for the supply of goods or services in any event.

34.    In the context of VAAL, section 233B has the effect that, unless the supplier is an excluded entity or has an excluded financial contract:

(i)    such supplier will not be able to terminate its contract, or exercise any other contractual right, solely as a result of the obtaining of the convening order unless VAAL consents; this is a permanent restriction;

14

(ii)    unless the supplier has purported to exercise its termination right prior to the obtaining of the convening order, such supplier will not be able to exercise any termination right (as a result of any other event of default arising prior to the obtaining of the convening order) in the period from the obtaining of the convening order to either the sanction of the restructuring plan or the court's decision not to sanction the restructuring plan. This is therefore a temporary restriction. It is the intention, however, for the restructuring plan to contain provisions waiving any events of default that arose prior to the sanction hearing and so, if the supplier is bound by the restructuring plan, this restriction would become permanent (as a result of the restructuring plan rather than as a result of section 233B;

(iii)    such supplier will, however, be able to exercise its termination right as a result of any event of default (other than the obtaining of the convening order) that occurs after the sanction of the restructuring plan (for example a payment default). It is not intended that the restructuring plan would prevent the exercise of post restructuring plan termination events.

## C. <u>Status of English proceedings</u>

35.    On 14 July 2020 and 15 July 2020, VAAL issued a practice statement letter (the **Practice Statement Letter**) to all creditors and members (the **Plan Creditors**) that will be affected by the restructuring plan being proposed by VAAL. A copy of the Practice Statement Letter is attached to this Declaration as <u>Exhibit B</u>. The Plan Creditors comprise each of the following persons[10]:

(i)    the Lenders as defined in the facility agreement dated 17 January 2018 between, among others, VAAL as borrower, Lloyds Bank Plc as agent and Lloyds Bank Plc as security agent (the **RCF Plan Creditors**);

---

[10]    It had originally been proposed that certain finance lessors and their lenders would be Plan Creditors but these creditors were removed from the Restructuring Plan when 100% of such creditors agreed to support the recapitalisation outside of the Restructuring Plan.

(ii)    the Lessors (the **Operating Lessor Plan Creditors**) as defined in the following

operating lease agreements:

(A)    the lease agreement dated 28 December 2015 between Wells Fargo Bank Northwest, National Association as Owner Trustee and VAAL as Lessee;

(B)    the lease agreement dated 16 June 2016 between Wells Fargo Bank Northwest, National Association as Owner Trustee and VAAL as Lessee;

(C)    the lease agreement dated 6 April 2017 between Wilmington Trust SP Services (Dublin) Limited as Trustee and VAAL as Lessee;

(D)    the lease agreement dated 30 January 2018 between Wilmington Trust SP Services (Dublin) Limited (as Trustee) and VAAL as Lessee;

(E)    the lease agreement dated 18 August 2014 between Aercap Global Aviation Trust (on behalf of Series One) as Lessor and VAAL as Lessee, and related Amendment and Novation Agreement dated 8 April 2019 between Aercap Global Aviation Trust (on behalf of series One) as Existing Lessor, Rhodium Funding Limited as New Lessor and VAAL as Lessee;

(F)    the lease agreement dated 30 December 2009 between Streamline Aircraft Leasing Ltd as Lessor and VAAL as Lessee;

(G)    the lease agreement dated 30 December 2009 between Streamline Aircraft Leasing Ltd as Lessor and VAAL as Lessee and related Deed of Novation and Amendment dated 11 April 2011 in relation to the Lease Agreement between Streamline Aircraft Leasing Ltd as Existing Lessor, AerCap Dutch Leasing VII B.V. as New Lessor, and VAAL as Lessee;

(H)    the lease agreement dated 30 December 2009 between Streamline Aircraft Leasing Ltd as Lessor and VAAL as Lessee and related Deed of Novation and Amendment dated 30 March 2012 in relation to the Lease Agreement between Streamline Aircraft Leasing Ltd as Existing Lessor, Scarlet Aircraft Leasing Limited as New Lessor and VAAL as Lessee;

(I)    the lease agreement dated 30 December 2009 between Streamline Aircraft Leasing Ltd as Lessor and VAAL as Lessee and related Deed of Novation and Amendment dated 15 November 2012 in relation to the Lease Agreement between Streamline Aircraft Leasing Ltd as Existing Lessor, Scarlet Aircraft Leasing Limited as New Lessor and VAAL as Lessee;

(J)    the lease agreement dated 30 December 2009 between Streamline Aircraft Leasing Ltd as Lessor and VAAL as Lessee and related Deed of Novation and Amendment dated 15 October 2012 in relation to the Lease Agreement

between Streamline Aircraft Leasing Ltd as Existing Lessor, Burgundy Aircraft Leasing Limited as New Lessor and VAAL as Lessee;

(K) the lease agreement dated 8 October 2014 between Wells Fargo Bank Northwest, National Association as Owner Trustee and VAAL as Lessee;

(L) the lease agreement dated 18 August 2014 between Aercap Global Aviation Trust as Lessor and VAAL as Lessee;

(M) the lease agreement dated 30 December 2009 between Streamline Aircraft Leasing Ltd as Lessor and VAAL as Lessee and related Deed of Novation and Amendment dated 5 December 2019 between Streamline Aircraft Leasing Ltd as Existing Lessor, VAAL as Lessee and Dara Aviation Charlie Ltd as New Lessor;

(N) the lease agreement dated 14 December 2017 between MDAC 3 Pte. Ltd. as Lessor and VAAL as Lessee and related Deed of Novation and Amendment dated 28 January 2019 between MDAC 3 Pte. Ltd. as Existing Lessor, VAAL as Lessee and Alterna Aircraft X1 LLC as New Lessor;

(O) the lease agreement dated 30 December 2009 between Streamline Aircraft Leasing Limited as Lessor and VAAL as Lessee and related (i) Deed of Novation and Amendment dated 24 February 2011 with respect to the Lease Agreement between Streamline Aircraft Leasing Limited as Existing Lessor, Rouge Aircraft Leasing Limited as New Lessor and VAAL as Lessee and (ii) Deed of Novation and Amendment dated 27 June 2019 between Rouge Aircraft Leasing Limited as Existing Lessor, VAAL as Lessee and Aviator IV 1195, Limited as New Lessor;

(P) the lease agreement dated 7 April 2016 between Avolon Aerospace AOE 121 Limited as Lessor and VAAL as Lessee;

(Q) the lease agreement dated 23 March 2018 between VAAL as Lessee and Avolon Aerospace AOE 157 Limited as Lessor;

(R) the lease agreement dated 30 September 2009 between Streamline Aircraft Leasing Limited as Lessor and VAAL as Lessee and related (i) Deed of Novation and Amendment dated 22 November 2011 between Streamline Aircraft Leasing Limited as Old Lessor, Wells Fargo Bank Northwest M.A. as New Lessor and VAAL as Lessee and (ii) Deed of Novation and Amendment dated 21 October 2013 between Wells Fargo Bank Northwest as

Existing Lessor, Emerald Aviation AOE 4 Limited as New Lessor and VAAL as Lessee;

(S)     the lease agreement dated 29 April 2015 between VAAL as Lessee and Avolon Aerospace AOE 104 Limited as Lessor;

(T)     the lease agreement dated 30 December 2009 between Streamline Aircraft Leasing Limited as Lessor and VAAL as Lessee and related Deed of Novation and Amendment dated 20 June 2012 between Streamline Aircraft Leasing Limited as Existing Lessor, GY Aviation Lease 1202 Co. Ltd as New Lessor and VAAL as Lessee;

(U)     the lease agreement dated 30 December 2009 between Streamline aircraft Leasing Limited as Lessor and VAAL as Lessee and related Deed of Novation and Amendment dated 9 August 2012 between Streamline aircraft Leasing Limited as Existing Lessor, APONE Aviation Leasing Co. Ltd. as New Lessor and VAAL as Lessee;

(V)     the lease agreement dated 14 December 2017 between KDAC Aircraft Holding Limited as Lessor and VAAL as Lessee and related Novation Deed dated 25 January 2018 between KDAC Aircraft Holding Limited as Existing Lessor, KDAC Aircraft Holding 3 Limited as New Lessor and VAAL as Lessee;

(W)     the lease agreement dated 13 April 2018 between Aircraft Wings MSN 322-2014 Limited as Lessor and VAAL as Lessee and related Novation and Amendment Agreement dated 27 June 2018 between Aircraft Wings MSN 322-2014 Limited as Existing Lessor, MSN 322, LLC as New Lessor and VAAL as Lessee; and

(X)     the lease agreement dated 9 March 2015 between VAAL as Lessee and Avolon Aerospace AOE 84 Limited as Lessor and related Novation and Amendment Agreement dated 16 March 2016 between Avolon Aerospace AOE 84 Limited as Old Lessor, VAAL as Lessee and OAS Aviation (UK) Limited as New Lessor;

(iii)     the entities (**Trade Plan Creditors**) listed on <u>Schedule 1</u> to this Declaration with respect to their arrangements with VAAL for the supply of goods and/or services of the type listed against their name in such Schedule; and

(iv)     the following creditors (the **Connected Party Plan Creditors**):

(A)     VAL TM Limited as counterparty of VAAL under the VAA trade mark licence dated 5 March 2014 entered into between VAAL, Virgin Enterprises Limited, Virgin Aviation TM Limited, Virgin Red Limited and VAL TM Limited,

together with the side letter dated 22 July 2016 and brand sub-licence and royalty agreement for flying club demerger dated 29 March 2019;

(B)     Delta Air Lines, Inc. as counterparty of VAAL under the joint venture transition agreement dated 15 May 2018 entered into between, among others, VAAL and Delta Air Lines, Inc; the joint venture agreement dated 11 December 2012 by and between Delta Air Lines, Inc. and VAAL (as amended and/or restated from time to time) and an agreement dated 25 March 2015 in relation to airline reservation, ticketing services and IT services entered into between VAAL and Delta Air Lines, Inc; and

(C)     Delta Air Lines, Inc. and Virgin Holdings Limited as original lenders under the £30,000,000 Facility Agreement for a GBP Revolving Credit Facility dated 29 March 2019 between VAAL as borrower, Virgin Travel Group Limited as guarantor and Delta Air Lines, Inc. and Virgin Holdings Limited as original lenders.

36.     Among other things, the Practice Statement Letter notified the Plan Creditors of VAAL's intention to propose the VAAL Plan, VAAL's intention to apply to the English Court for permission to convene meetings of the Plan Creditors for the purpose of voting on the restructuring plan, and the composition of the proposed classes. Having considered the rights and interests of the Plan Creditors, VAAL has concluded that it is appropriate that separate meetings are held for the RCF Plan Creditors, the Operating Lessor Plan Creditors, the Trade Plan Creditors and the Connected Party Plan Creditors, in each case, for the purposes of voting on the VAAL Plan.

37.     The application to the English Court was accompanied by a draft explanatory statement (the **VAAL Explanatory Statement**). The VAAL Explanatory Statement[11] is attached to this Declaration as Exhibit C. The Plan is at Part D of the VAAL Explanatory Statement.

38.     On 4 August 2020, the English Court held the convening hearing and subsequently issued a convening order (the **Convening Order**) which is attached to this Declaration as Exhibit D. The English Court found that it had jurisdiction in relation to the VAAL Plan and ordered, among other things, that: (i) VAAL convene the meetings to be held at 2.00pm (London time) on 25 August

---

[11]     Because the appendices to the VAAL Explanatory Statement are voluminous, Appendices 9 to 30 are not being filed herewith but are available to the Plan Creditors through the website marinated by VAAL's information agent at: www.lucid-is.com/virginatlantic.

2020 by way of video conference; and (ii) the Explanatory Statement be distributed to all Plan Creditors. The Convening Order further authorizes Shai Weiss, the Chief Executive Officer of VAAL, to act as the foreign representative of VAAL in respect of any chapter 15 case that may be commenced in the United States.

39.    It is currently anticipated that the Sanction Hearing in respect of the VAAL Plan (the **Sanction Hearing**) will be held on 2 September 2020. If the English Court approves the Sanction Order, the VAAL Plan will become effective, and thereby binding as a matter of English law on all Plan Creditors, wherever located, upon delivery of the Sanction Order to the Registrar of Companies of England and Wales. Because this Court's issuance of an order recognising and enforcing the VAAL Plan in the United States under chapter 15 of the Bankruptcy Code is a condition precedent to the implementation of the VAAL Plan, although the VAAL Plan will become effective upon delivery of the Sanction Order to the Registrar of Companies of England and Wales, the VAAL Plan will not be implemented unless and until this Court has issued an order recognising and enforcing the VAAL Plan in the United States under chapter 15 of the Bankruptcy Code and all other conditions precedent to the VAAL Plan have been satisfied.

40.    Accordingly, the relief requested by the Foreign Representative under chapter 15 of the Bankruptcy Code is necessary to both implement the VAAL Plan and give effect to the VAAL Plan in the United States and will best assure an economical, expeditious, and fair and efficient administration of the VAAL Plan that protects the interests of VAAL and the Plan Creditors. Based on the foregoing, I believe that the relief requested in VAAL's Chapter 15 Case should be granted in full.

[*Intentionally left blank*]

41.    I declare under penalty of perjury under the laws of the United States of America that

the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 4th day of August, 2020, London, England

_____

JENNIFER MARSHALL

**Schedule 1**

**Trade Plan Creditors**

1.      1ST CHOICE AEROSPACE

2.      20 20 LIMITED

3.      ACCELERATED COURIER INC

4.      ACCOR SA

5.      ACTIVE ENTERTAINMENT MANAGEMENT LTD

6.      ADOBE SYSTEMS SOFTWARE IRELAND LTD

7.      ADVANCE FUMIGATION & PEST CONTROL LTD

8.      ADVANCED TOOLING SYSTEMS UK LTD

9.      AERO MAG 2000 BOS LLC

10.     AERO TECHNICS LIMITED

11.     AEROPEOPLE LTD

12.     AIRLINES ASSOCIATION BARBADOS INC

13.     AIRLINES TECHNICAL SUPPORT (AIR TECHS)

14.     ALEXANDRA SWANSEA LTD

15.     ALLIANCE GROUND INTERNATIONAL LLC

16.     AMBIENCE CONTRACTS LTD

17.     AON SOLUTIONS UK LIMITED

18.     ASPERA GMBH

19.     AVENSYS LTD

20.     AVTURA LTD

21.     BAGGAGE AIRLINE GUEST SERVICES INC

22.     BALLARD CHALMERS LIMITED

23.     BAXTER STOREY LTD

24.    BB&R LIMITED

25.    BENEFEX LIMITED

26.    BLACK SUN PLC

27.    BOLLORE LOGISTICS UK LIMITED

28.    BRYT ENERGY LIMITED

29.    CARIBBEAN AIRCRAFT HANDLING CO. LTD

30.    CASEBANK TECHNOLOGIES INC

31.    CATHAY PACIFIC CATERING SERVICES HK LIMITED

32.    CERTES COMPUTING LIMITED

33.    CLEAR IDEAS CONSULTANCY LLP

34.    COBALT GROUND SOLUTIONS LTD

35.    COCONUT BAY BEACH RESORT & SPA

36.    COGNIZANT WORLDWIDE LTD

37.    CONTENT SQUARE S.A.S.

38.    CRA INTERNATIONAL (UK) LTD

39.    CROMWELL TOOLS LIMITED

40.    CUBIQUITY LIMITED

41.    DASSAULT SYSTEMES UK LIMITED

42.    DESTER BVBA

43.    DISPATCH SERVICES ANTIGUA LTD

44.    DNATA LIMITED

45.    DPR CONSTRUCTION A GENERAL PARTNERSHIP

46.    ENHANCE MEDIA LTD

47.    ENSIGHTEN INC

48.    ESP COLOUR LTD

49.    EXPERIAN LTD

50. FATTAL HOTELS LTD

51. FLORIDA HOTEL AND CONFERENCE CENTRE

52. FLYBE LIMITED

53. FLYTE TYME MANAGEMENT SERVICES INC

54. FORWARD 3D LIMITED

55. GCG GROUND SERVICES JAMAICA LTD

56. GE ENGINE SERVICES LLC

57. GEN2 SYSTEMS LTD

58. GLOBAL AVIATION MANAGEMENT GROUP, CORP

59. GODDARD CATERING GROUP INC

60. GOGO LLC

61. GOOD BUSINESS LTD

62. GOWLING WLG UK LLP

63. HALLMARK CONNECTIONS LIMITED

64. HARDINGS PRINT SOLUTIONS LIMITED

65. HILTON BARBADOS RESORT

66. HILTON GLENDALE

67. HONG KONG AIR CARGO TERMINALS LTD

68. HYDRO SYSTEMS KG

69. I6 SYSTEMS LTD

70. IBEROSTAR DISTRIBUCION SL

71. ICF SH AND E LIMITED

72. INCORPORATEWEAR LTD

73. INFARE SOLUTIONS A/S

74. INFLIGHT PRODUCTIONS LIMITED

75. JAMCO CORPORATION

76.    JAMES CHASE SOLUTIONS LIMITED

77.    JET AIRWAYS OF THE UNITED STATES, INC

78.    JET MASTERCLASS UK LTD

79.    K2 GLOBAL LIMITED

80.    KINNARPS UK LTD

81.    KIRKHILL AIRCRAFT PARTS CO

82.    LINSTOL UK LTD

83.    LORIEN RESOURCING LIMITED

84.    LSG SKY CHEFS SOUTH AFRICA (PTY) LTD

85.    LUFTHANSA TECHNIK AG

86.    LUMESSE LIMITED

87.    MANCHESTER PRIDE LTD

88.    MANORHEIM BUSINESS AND AVIATION CONSULTANCY LIMITED

89.    MARRIOTT HOTEL SERVICES INC D/B/A BOSTON MARRIOTT COPLEY PLACE

90.    MARRIOTT INTERNATIONAL INC

91.    MEL AVIATION LTD

92.    MENZIES AVIATION UK LIMITED

93.    MIAMI MARRIOTT DADELAND

94.    MICHELIN AIRCRAFT TYRE

95.    MILITARY PILOT SUPPLY OF TEXAS INC DBA FLY BOYS

96.    MNH SUSTAINABLE CABIN SERVICES LIMITED

97.    MUMBAI AIRPORT LOUNGE SERVICES PVT LTD

98.    NEW TERRITORY DESIGN LTD

99.    NEW YORKER HOTEL MANAGEMENT D/B/A WYNDHAM NEW YORKER HOTEL

100.    OCS GROUP UK LTD

101.    OLDWAY SWANSEA LTD

102.    OLIVER WYMAN LIMITED

103.    OMNI SHOREHAM CORPORATION D/B/A OMNI SHOREHAM HOTEL

104.    ONETRUST TECHNOLOGY LIMITED

105.    OPENMARKET LTD

106.    ORVEC INTERNATIONAL LTD

107.    PAN AFRICA CATERING EPZE (SERVAIR NIGERIA)

108.    PAN ASIA PACIFIC AVIATION SERVICES LTD

109.    PANASONIC AVIONICS CORPORATION

110.    PARAGON CUSTOMER COMMUNICATIONS (LONDON) LIMITED

111.    PHD MEDIA LIMITED

112.    PLAZA PREMIUM LOUNGE MANAGEMENT LIMITED

113.    PORSCHE CONSULTING GMBH

114.    PRIMEFLIGHT AVIATION SERVICES INC

115.    PRISM GROUP INC

116.    PROJECT TRISTAR LIMITED

117.    PROMINATE LTD

118.    PROS HOLDINGS INC

119.    PROXIMITY LONDON LTD

120.    RADEUS ADVERTISING PRIVATE LIMITED

121.    RAPP LTD

122.    REX RESORTS INC

123.    RIVER PW HOTEL LIMITED PARTNERSHIP

124.    SAFRAN AEROSYSTEMS SERVICES UK LIMITED

125.    SAFRAN NACELLES SAS

126.    SAFRAN SEATS GB LIMITED

127.    SAN FRANCISCO LESSEE LLC D/B/A HILTON SAN FRANCISCO UNION SQUARE

128.   SAN FRANCISCO LESSEE LTD

129.   SANDTON HOTEL PROPRIETARY LIMITED

130.   SAP UK LTD

131.   SEAL DYNAMICS LLC

132.   SEETEC BUSINESS TECHNOLOGY CENTRE LTD

133.   SEKO LOGISTICS (LONDON) LIMITED

134.   SHERATON BOSTON HOTEL

135.   SHORT BROTHERS PLC

136.   SIGNAL COMPUTER SYSTEMS LTD

137.   SOFTWAREONE UK LIMITED

138.   SPAFAX AIRLINE NETWORK LTD

139.   SPIRIANT GMBH

140.   SR TECHNICS SWITZERLAND LIMITED

141.   STAC ARCHITECTURE LTD

142.   STANTON HOUSE LIMITED

143.   STREAM PUBLISHING LIMITED

144.   SWISSPORT IRELAND LTD

145.   TAIKOO (XIAMEN) AIRCRAFT ENGINEERING CO LTD

146.   TATA CONSULTANCY SERVICES LTD

147.   THE AIR LAW FIRM LLP

148.   THE BOSTON CONSULTING GROUP UK LLP

149.   THE GARDEN CITY HOTEL

150.   THS COURIERS LTD

151.   TRANSPERFECT TRANSLATIONS LIMITED

152.   TRAVELLIANCE GLOBAL LTD

153.   TRAX USA CORP

154.    TROPICANA LAS VEGAS INC

155.    ULTIMA BUSINESS SOLUTIONS LIMITED

156.    UNICAL AVIATION INC

157.    UNIVERSAL STUDIOS INTERNATIONAL BV

158.    VARLIN STORAGE LIMITED

159.    VIRTUAL HUMAN RESOURCES LTD

160.    WARWICK CORPORATION D/B/A WARWICK SEATTLE

161.    WATERMARK LIMITED

162.    WESCO AIRCRAFT EMEA LIMITED

163.    WNS GLOBAL SERVICES (UK) LIMITED

164.    WPI STRATEGY LIMITED

165.    XERETEC OFFICE SYSTEMS LTD

166.    ZENON RECRUITMENT LTD